**Cynthia KEEHR and Bruce Keehr, Plaintiffs-Appellees,**

v.

**CONSOLIDATED FREIGHTWAYS OF DELAWARE, INC., Defendant-Appellant.**

No. 86–2126.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 9, 1987.

Decided July 15, 1987.

basis for stating that Judge Williams acted to punish these defendants for exercising their

right to trial.

Jay Robert Larkin, Roberts, Ryder, Rogers & Scism, Indianapolis, Ind., for defendant-appellant.

Ernest M. Beal Jr., Parrish Knight & Beal, Fort Wayne, Ind., for plaintiffs-appellees.

Before BAUER, Chief Judge, CUDAHY and POSNER, Circuit Judges.

CUDAHY, Circuit Judge.

Consolidated Freightways ("CF") is engaged in the interstate carriage of freight. Bruce Keehr is employed as a dockman by CF at its facility in Fremont, Indiana; his duties include loading and unloading trailers. This suit grew out of a remark that a CF supervisor, Ronald Nisun, made to Bruce during a verbal and physical altercation between the two men on February 22, 1984.[1] The fight between Bruce and Nisun

---

**1.** Because two Keehrs are involved in this suit, we shall refer to Cynthia and Bruce Keehr by their first names.

began when Nisun asked Bruce how long it was going to take him to finish loading a truck; Nisun apparently used offensive language in addressing Bruce. Bruce made several angry retorts, and the two men separated. Bruce subsequently left the trailer he was loading and approached Nisun, ostensibly to ask Nisun for a fork-lift. The two men again exchanged heated words, and the verbal assaults soon escalated into a fist fight. At some point in the dispute, Nisun allegedly said that he had "heard the other night that [Bruce's] wife was fucking and sucking three niggers." Tr. at 212. This remark forms the basis of the suit here.[2]

Bruce and Cynthia brought a diversity suit in federal court against CF.[3] Cynthia alleged that Nisun's remark defamed her and invaded her privacy. Bruce also alleged that the remark invaded his privacy; in addition, he brought a claim of intentional infliction of emotional distress. The Keehrs maintained at trial that the February 22 incident was not an isolated act but that Nisun was operating under the direction of CF management. Bruce maintained that he was on a "hit list" of employees targeted for harassment by management. According to Bruce, the list was composed of employees whom management considered to be troublemakers; management allegedly instructed CF supervisors to make crude and vulgar remarks about the families of these employees to cause them distress and to provoke them to throw a punch at a supervisor in order to give the company a basis to discharge the employee. CF's position at trial was that Bruce initiated the physical contact and that although angry comments were exchanged between Bruce and Nisun, none of the comments defamed Cynthia. CF also denied the existence of a plot to harass employees.

The parties stipulated that the jury could award damages only for the nonphysical injuries flowing from the November 22 incident. The plaintiffs were not seeking compensation for the medical bills incurred as a result of Bruce's injuries nor were they asking damages based on Bruce's discharge. The jury found against Cynthia on her defamation claim but for her on the privacy count. The jury awarded Cynthia $20,000 in actual damages but denied her request for punitive damages. The jury returned a verdict in favor of Bruce on both his claims. The jury awarded Bruce nominal damages of $1.00 on each claim and $50,000 in punitive damages. The district court denied CF's motion in the alternative for judgment notwithstanding the verdict ("JNOV") or for a new trial.

On appeal, CF raises a number of challenges to the jury verdicts. CF argues that Bruce's claims are preempted by federal labor law, and if they are not preempted, that Bruce failed to establish the elements of the torts of invasion of privacy and intentional infliction of emotional distress. CF also challenges the award of punitive damages to Bruce. With respect to Cynthia's claims, CF's position is that the jury verdicts were inconsistent, and accordingly, the district court erred in denying its motion for JNOV or a new trial. Further, CF alleges that the award of $20,000 in compensatory damages to Cynthia is unsubstantiated by the evidence. We reject all of these claims and affirm the jury verdicts.

### I.

CF's first argument is that Bruce's tort claims are preempted by federal labor law because "the Keehr-Nisun incident was simply a continuation of the long running dispute between Keehr and his supervisors over work rules and working conditions at the facility" and a reflection of the labor problems that existed between the dock

---

2. Although Bruce was discharged as a result of this altercation, he was eventually reinstated with partial back pay after a grievance proceeding.

3. The Keehrs did not sue Nisun but instead sued CF under the theory of *respondeat superior*.

workers and management at the Fremont facility. Appellant's Brief at 15.[4]

The Supreme Court has developed several different preemption doctrines in the labor law context. CF's preemption argument apparently implicates two of these doctrines. One doctrine, articulated in *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245–46, 79 S.Ct. 773, 779–80, 3 L.Ed.2d 775 (1959), prohibits states from regulating conduct protected, prohibited or arguably affected by sections 7 and 8 of the National Labor Relations Act (the "NLRA"), 29 U.S.C. §§ 157, 158. *See also Lingle v. Norge Div. of Magic Chef, Inc.*, 823 F.2d 1031, 1042 (7th Cir.1987) (*en banc*). *Garmon* preemption protects the primary jurisdiction of the NLRB. A second preemption principle, recently discussed by the Supreme Court in *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), involves the preemptive effect of section 301 of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 185(a). Section 301 provides:

> (a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties. . . .

29 U.S.C. § 185(a). The purpose underlying section 301 preemption is the promotion of interpretive uniformity of collective bargaining agreements through application of uniform federal law. *Allis-Chalmers*, 471 U.S. at 210–11, 105 S.Ct. at 1910–11; *see also International Bhd. of Elec. Workers v. Hechler*, ── U.S. ──, 107 S.Ct. 2161, 2165, 95 L.Ed.2d 791 (1987). Although not entirely clear from its brief, CF apparently argues that Bruce's claims are preempted

both under the *Garmon* rule and under section 301.

The question whether a state law claim for intentional infliction of emotional distress is preempted by sections 7 and 8 of the NLRA was resolved by the Supreme Court in *Farmer v. United Bhd. of Carpenters & Joiners*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977). The Court held in *Farmer* that a claim based on this tort is not preempted if certain conditions are met; these conditions are intended to ensure that recognition of the tort claim will not interfere with the federal labor law scheme. To preclude preemption, a claim for intentional infliction of emotional distress must be

> either unrelated to employment discrimination or a function of the particularly abusive manner in which the discrimination is accomplished or threatened rather than a function of the actual or threatened discrimination itself.

*Id.* at 305, 97 S.Ct. at 1066 (footnote omitted). Further, the claim must be based on "outrageous" conduct and not simply "on the type of robust language and clash of strong personalities that may be commonplace in various labor contexts." *Id.* at 306, 97 S.Ct. at 1066; *see also Linn v. United Plant Guard Workers*, 383 U.S. 53, 65, 86 S.Ct. 657, 664, 15 L.Ed.2d 582 (1966) (tort of libel is not preempted if plaintiff "can show that the defamatory statements were circulated with malice and caused him damage"; requirement that malice be shown will minimize the possibility that labor debate will be chilled by the threat of state libel suits).[5]

■ The district court rejected CF's preemption argument, concluding that Bruce's claims were "based on the abusive manner in which the plan to get Bruce Keehr fired was carried out, not a claim based on the plan itself." Tr. at 323. We agree. Bruce was not seeking damages based on the fact of discriminatory treatment; instead, he

---

**4.** CF does not claim on appeal that its preemption argument is relevant to Cynthia's claims.

**5.** The Court also indicated that, to protect against interference with federal labor law, the courts must ensure that the amount of damages

awarded is not excessive. *Farmer,* 430 U.S. at 306, 97 S.Ct. at 1066. The issue whether the damages awarded with respect to Bruce's claims were excessive is discussed below. *See infra* p. 142.

limited his claim to damages flowing from the manner adopted by CF management to carry out its plan.

We also conclude that the jury found that Nisun's remark was not simply an "angry jab" spoken during the heat of a dispute but instead constituted "outrageous" conduct. The jury was instructed that, in order for Bruce to establish his claim of intentional infliction of emotional distress, he had to show that Nisun's actions were "wilful, callous, or malicious" and were likely to provoke "an emotional disturbance or trauma, such as fright, shock, humiliation, insult, vexation, inconvenience, worry, or apprehension." Tr. at 591. "Wilful, callous, or malicious" actions certainly fall within the category of "outrageous conduct."

The Supreme Court has not yet decided the question whether the tort of invasion of privacy is preempted by the NLRA. Applying the preemption framework developed in *Farmer*, we conclude that Bruce's claim based on the tort of invasion of privacy is not preempted by sections 7 and 8 of the NLRA. Because the same conduct underlies Bruce's claims for intentional infliction of emotional distress and for invasion of privacy, we simply repeat here our prior conclusion that Bruce's claims were based, not on the fact that Nisun's remarks may have been part of a plot by management to get Bruce fired, but on "the particularly abusive manner" in which the alleged plan was carried out. We also conclude that the spectre of a state tort suit for invasion of privacy will not unduly interfere with debate in the labor context because to establish such a claim under Indiana law, the plaintiff must show "an intentional interference with or intrusion into ... a plaintiff's interest in solitude or seclusion ... in a manner that is *highly offensive to a reasonable person*." Tr. at 590 (emphasis added).

The jury was further instructed that, for it to award punitive damages on Bruce's claims or on Cynthia's invasion of privacy claim, it must find "that the wrongful act was undertaken with malice or oppression and that the conduct is inconsistent with a hypothesis of mere negligence, mistake of law or fact, overzealousness or other non-iniquitous human failing...." Tr. at 595. The jury instructions defined malicious or oppressive conduct as conduct "intended by the defendant to cause injury to the plaintiff or ... carried on by the defendant with a conscious disregard of the plaintiff's rights." *Id.* Given the jury's award of punitive damages to Bruce in light of these instructions, we conclude that the jury necessarily found Nisun's conduct to be "outrageous."

■ We also conclude that neither of Bruce's claims is preempted by section 301 of the LMRA. The analysis of the preemptive effect of section 301 focuses on whether the state tort action "confers nonnegotiable state-law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract." *Allis-Chalmers,* 471 U.S. at 213, 105 S.Ct. at 1912. CF argues that Bruce's claims are preempted because he could have filed a grievance against Nisun for using abusive language. The mere fact that Bruce might be able to grieve Nisun's conduct under procedures provided in the collective bargaining agreement is not sufficient in itself to conclude that Bruce's tort claims are preempted. The crucial issue under *Allis-Chalmers* is not whether a claim can be taken through the grievance process but whether the state law tort claim being asserted purports to give meaning to the terms of the labor contract. CF has not suggested that Bruce's claims are in any way derived from rights or duties provided for under the contract. Because the resolution of Bruce's tort claims in no way depends on an interpretation of the labor contract, we conclude that Bruce's claims are not preempted by section 301.[6] *Accord Tellez*

---

6. Cases that have found claims based on intentional infliction of emotional distress and invasion of privacy preempted are readily distinguishable. Thus, in *Buscemi v. McDonnell Douglas Corp.,* 736 F.2d 1348 (9th Cir.1984), an employee brought a claim alleging intentional

*v. Pacific Gas & Elec. Co.,* 817 F.2d 536, 539 (9th Cir.1987) (claim of intentional infliction of emotional distress was not preempted because "collective bargaining agreement does not envision such [outrageous] behavior" by employer and "its grievance mechanism is not equipped to redress it"); *cf. Lingle,* 823 F.2d at 1046 (state tort suit alleging retaliatory discharge for filing a workman's compensation claim is preempted by section 301 because it implicates the "just cause" provision of the collective bargaining agreement).

## II.

■ CF next argues that the jury verdicts with respect to Cynthia's claims are inconsistent, and accordingly, the district court should have granted CF's motion for JNOV or a new trial at least with respect to these claims. Cynthia's invasion of privacy and defamation claims were both premised on the alleged statement made by Nisun on November 22. The district court instructed the jury that "[w]ords which falsely charge a person with fornication, adultery, or whoredom are considered slanderous as a matter of law," Tr. at 589–90, that the law presumes that such statements are false and were spoken with malice, and that the burden is on the defendant to overcome these presumptions, *id.* at 590. In light of this instruction, CF argues that since the jury found against Cynthia on her defamation claim, it must have concluded that the statement was not made, because Nisun's comment, if it were spoken, would constitute slander per se. Yet, the jury

found for Cynthia on her invasion of privacy claim, despite the fact that this claim was based solely on this same comment.

The district court rejected this argument, finding that the verdicts were not necessarily in conflict. We agree with the court's reasoning on this point. In reviewing jury verdicts, a "[c]ourt indulges every reasonable presumption in favor of the legality of jury verdicts." *Indianapolis Newspapers, Inc. v. Fields,* 254 Ind. 219, 257, 259 N.E.2d 651, 668 (citations omitted), *cert. denied,* 400 U.S. 930, 91 S.Ct. 187, 27 L.Ed.2d 190 (1970). The jury could have found that the statement was made but that it was not slanderous. The district court started with the premise that the jury must have found that the statement was made because it returned a verdict for Cynthia on invasion of privacy, and the statement was the only basis for this claim. Contrary to CF's position, the jury was not instructed that if it found that the statement was made, the comment necessarily constituted slander per se. Instead, the jury was instructed that it must undertake a two-part examination. First, it had to decide whether Nisun in fact made the statement. It then had to determine whether the statement made fell within one of the slander per se categories. Thus, the jury might have concluded that, although Nisun made the statement, the words spoken did not charge "fornication, adultery or whoredom." Although Nisun's statement seems to fall within the definition of slander per se, the jury could well have concluded that it did not.[7]

infliction of emotional distress resulting from "the callous and insensitive manner of his termination." *Id.* at 1352. The court concluded that Buscemi's state law tort claim was preempted under the NLRA because he effectively was alleging only that he "was fired without good cause and that as a result he suffered emotional distress." *Id.* Here, by contrast, the employee is claiming that his emotional distress resulted from abusive statements made to him by his supervisor; he does not seek any damages flowing from his discharge. Similarly, the employee's invasion of privacy claim in *Kirby v. Allegheny Beverage Corp.,* 811 F.2d 253 (4th Cir. 1987), was found to be preempted by section 301 because resolution of his claim would involve consideration of the employer's power under the collective bargaining agreement to con-

duct searches of employees and their cars when drug use is suspected. *Id.* at 256. In the case before us, the employee's claim revolved around conduct by his employer that is not even arguably sanctioned by the labor contract.

7. Another possible explanation for the two verdicts is that the jury simply misunderstood the court's instructions. Cynthia testified that she was not aware of any damage to her reputation resulting from Nisun's statement. Tr. at 332. Under the court's instructions on slander, Cynthia's testimony should not have precluded the jury from returning a verdict in her favor on the defamation claim. Her testimony went only to the question of damages. The jury, however, might have thought that, without any evidence

### III.

CF next argues that the jury award of $20,000 in actual damages for Cynthia's invasion of privacy claim is unsubstantiated by the record because Cynthia failed to offer any evidence regarding her damages. However, as the district court noted when CF raised this argument before it, Bruce testified that Cynthia was "shocked" and "greatly upset" when he related Nisun's statement. Although the damages awarded to Cynthia seem high, we cannot conclude that they are "so grossly and outrageously excessive as to induce the belief that they were the result of prejudice, partiality or corruption...." *Northern Ind. Pub. Serv. Co. v. Otis*, 145 Ind.App. 159, 186, 250 N.E.2d 378, 395–96 (1969). In an action for invasion of privacy under Indiana law, damages can include, but are not limited to, "compensation for the embarrassment, humiliation and mental pain [that] a person of ordinary sensibilities would have suffered under the circumstances." *Continental Optical Co. v. Reed*, 119 Ind.App. 643, 651, 86 N.E.2d 306, 309 (1949). Nisun's statement was clearly an outrageous intrusion into Cynthia's personal life. Nisun falsely charged Cynthia with conduct that most persons would find highly offensive. Cynthia's humiliation could only have been increased by the fact that this accusation was hurled at her husband at his place of employment and that others might easily have heard the comment. Under these circumstances, we cannot say that the damage award was excessive.

### IV.

CF next attacks the verdicts by arguing that Bruce failed to establish the elements of the tort of invasion of privacy. CF argues that Indiana law has never recognized a claim for invasion of privacy predicated solely on an oral comment by the defendant. The company also claims that the comment made by Nisun concerned only Cynthia, and therefore, Bruce cannot assert an invasion of privacy claim because Indiana has never recognized a "derivative" invasion of privacy theory. CF, however, waived these claims for purposes of appeal because there is nothing in the record indicating that CF ever presented them properly to the district court.

When CF *orally* moved for a JNOV immediately after the jury returned its verdict, the company did raise an objection based on the derivative nature of the harm to Bruce, but it did not argue at that time that an oral comment could not support an invasion of privacy claim. When CF subsequently filed its formal motion for a JNOV/new trial, it apparently did not pursue either argument. Although CF's memorandum in support of its motion was not included in the record on appeal, the documents that are before us suggest that CF's motion did not include these objections. The district court's order denying CF's motion carefully enumerated each objection raised by CF, but it does not mention these two arguments nor does the Keehrs' memorandum in opposition address either point. Further, in face of the Keehrs' specific charge on appeal that these claims have been waived, CF failed to address this problem in its brief. When pressed on this point during oral argument, CF's only response was that it thought that it had raised the "oral comment" objection in its motion for a new trial. The record, however, suggests that it did not.[8]

### V.

CF's final argument is that the jury's award of $50,000 to Bruce in punitive damages should be overturned. CF raises a number of points to support its position, none of which we find persuasive.

### A.

First, the defendant claims that the award of only $1.00 in nominal damages on

of damage to her reputation, it could not find for Cynthia on this claim.

**8.** Because we uphold the verdict for Bruce on his claim of invasion of privacy, we reject CF's argument that Bruce failed to establish a "host tort," which is a necessary prerequisite under Indiana law to establishment of a claim of intentional infliction of emotional distress.

each of Bruce's claims precludes an award of punitive damages. As CF correctly points out, under Indiana law punitive damages cannot be recovered if compensatory or actual damages have not been awarded. *First Fed. Sav. & Loan Ass'n v. Stone,* 467 N.E.2d 1226, 1235–36 (Ind.App. 3d Dist. 1984); *Hahn v. Ford Motor Co.,* 434 N.E.2d 943, 954 (Ind.App. 2d Dist.1982); *Baker v. American States Ins. Co.,* 428 N.E.2d 1342, 1351 (Ind.App. 1st Dist.1981). CF argues that nominal damages are not compensatory, and therefore, because Bruce recovered only $1.00 on each of his claims, the award of punitive damages cannot stand.

Contrary to the defendant's assertion, Indiana law does not clearly provide that nominal damages can never support an award of punitive damages. The Indiana cases cited by the defendant to support its position primarily involve situations in which compensatory damages were not available to a plaintiff in any amount because the plaintiff lost on the merits or because he could not establish that he suffered any damage as a result of the defendant's conduct. *Skinner v. Martin,* 455 N.E.2d 1168, 1171 (Ind.App. 1st Dist.1983); *Hahn,* 434 N.E.2d at 954; *Large v. Gregory,* 417 N.E.2d 1160, 1164–65 (Ind.App. 2d Dist.1981); *McCormick Piano & Organ Co. v. Geiger,* 412 N.E.2d 842, 852 (Ind. App. 3d Dist.1980).

Only two Indiana decisions cited by the defendant lend any support to its contention that nominal damages cannot support an award of punitive damages. In *Newton v. Yates,* 170 Ind.App. 486, 353 N.E.2d 485 (1st Dist.1976), the appellate court reviewed the trial court's decision to limit the scope of a trial to the questions of liability and damages flowing from the defendants' alleged negligence, reserving the issue of punitive damages for a separate trial. The appellate court concluded that the decision to conduct separate trials was proper because the jury's determination of the issues presented in the first trial might moot the issue of punitive damages. In reaching this conclusion, the appellate court stated:

Apparently Indiana has never affirmatively taken a position on the question of nominal damages being a prerequisite for allowing punitive damages. In a number of cases Indiana has held that punitive damages must be in some reasonable proportion to the compensatory damages awarded [citation omitted]. From that holding, it is but a short and logical step to follow the better reasoned decisions of foreign jurisdictions in requiring compensatory damages as a prerequisite for any award of punitive damages. [citations omitted].

170 Ind.App. at 495, 353 N.E.2d at 491. We find *Newton* dubious authority for CF's position. First, *Newton* itself did not involve an award of nominal damages; the plaintiff lost at the liability stage. Second, the premise underlying the statement from *Newton* is that punitive damages must be in some reasonable ratio to compensatory damages; hence, nominal damages could never support an award of punitive damages of any magnitude. However, the notion that punitive damages must be in some reasonable proportion to actual damages has been discredited by the Supreme Court of Indiana. *See Hibschman Pontiac, Inc. v. Batchelor,* 266 Ind. 310, 317, 362 N.E.2d 845, 849 (1977); *see also infra* p. 142. In *Broadacre Trailer Lodge, Inc. v. Johnson,* 439 N.E.2d 684 (Ind.App. 1st Dist.1982), another case relied on by CF, an Indiana court of appeals quoted the above language from *Newton,* seemingly with approval. *Id.* at 685–86. The court, however, then went on to quote the following passage without comment:

"In general actual damages must be shown in order that exemplary damages may be recoverable, but in some jurisdictions an award of nominal damages is a sufficient basis for the recovery of exemplary damages which are otherwise recoverable.

\*     \*     \*     \*     \*     \*

... As it has been otherwise stated, expressly or in substance, exemplary damages cannot constitute the basis of a cause of action, but are merely incidental to the cause of action."

*Id.* at 686 (quoting 25 C.J.S. *Damages* § 118). Given these conflicting signals, we do not read *Broadacre* as endorsing the proposition that nominal damages can never support an award of punitive damages, especially since the jury in *Broadacre* had awarded punitive damages without awarding any compensatory damages.

While the question whether nominal damages can support an award of punitive damages has not been decided under Indiana law, a number of other jurisdictions have addressed this issue. A substantial number of states would permit punitive damages to be awarded on the basis of nominal damages, at least under some circumstances.[9] In light of the more recent opinions of the Indiana Supreme Court that have addressed the issue of punitive damages, we think that court would uphold the award of punitive damages in this case. As the Indiana Supreme Court noted in *Orkin Exterminating, Co. v. Traina,* 486 N.E.2d 1019, 1022 (Ind.1986), punitive damages are "not compensatory in nature but are designed to punish [and deter] the wrongdoer" and may be awarded upon a showing of wilful and wanton misconduct. Given this premise, the appropriateness of a punitive damage award is determined by the degree of the defendant's misconduct rather than by the amount of compensatory damages awarded. Our conclusion that the availability of punitive damages under Indiana law is not dependent on the amount of compensatory damages awarded is also supported by the Indiana Supreme Court's decision in *Hibschman,* 362 N.E.2d 845. In that case, the court stated that a high ratio of punitive to compensatory damages is not conclusive of an improper award but is only evidence that the jury, in setting the amount of punitive damages, might have been guided by "passion or prejudice." *Id.* at 849. Therefore, we conclude that punitive damages are not precluded in this case simply because the only other damages recovered by Bruce were nominal in amount.

## B.

The defendant next argues that the plaintiffs did not establish intentional or malicious conduct by clear and convincing evidence. The plaintiffs' theory on the punitive damages issue is that the defendant, acting through Nisun, was guilty of wilful or malicious conduct when Nisun dragged Cynthia's name into the fight. Because punitive damages are penal in nature, a defendant's actions are presumed to be attributable to "noniniquitous human failings" rather than to malicious design. *Orkin Exterminating,* 486 N.E.2d at 1023. To overcome this presumption, malicious or intentional conduct must be established by clear and convincing evidence. *Id.* at 1022–23. To establish a claim for punitive damages:

**9.** In the following cases, courts have indicated that an award of nominal damages can support punitive damages: *Ress v. Rediess,* 130 Colo. 572, 579, 278 P.2d 183, 186–87 (1954) (some amount must be awarded as actual damages, even if nominal in amount, to permit recovery of punitive damages); *Topanga Corp. v. Gentile,* 249 Cal.App.2d 681, 691, 58 Cal.Rptr. 713, 719 (2d Dist.1967) (requirement that actual damages be recovered to support an award of punitive damages focuses on the establishment of a tortious act, not on the amount recovered); *Lane County v. Wood,* 298 Or. 191, 202, 691 P.2d 473, 479 (1984) ("certain intentional acts require no award of actual damages, due to special circumstances surrounding the misconduct, to support an award of punitive damages"); *Maring-Crawford Motor Co. v. Smith,* 285 Ala. 477, 486, 233 So.2d 484, 492 (1970) ("an award of nominal damages authorizes, in the discretion of the trier of fact, the award of punitive damages where legal malice, willfulness, and a reckless disregard accompanies the invasion of the rights of another"); *Lawrence v. Risen,* 598 S.W.2d 474, 476 (Ky.Ct.App.1980); *Beavers v. Lamplighters Realty, Inc.,* 556 P.2d 1328, 1333 (Okla. Ct.App.1976); *Lassitter v. International Union of Operating Eng'rs,* 349 So.2d 622, 625–26 (Fla. 1976); *Shell Oil v. Parker,* 265 Md. 631, 644, 291 A.2d 64, 71 (1972). *See* 40 A.L.R. 4th 11, 36–39 (1985) (collecting cases).

Cases in which courts have stated that an award of punitive damages would not be allowed when the only other damages awarded were nominal include *Magma Copper Co. v. Shuster,* 118 Ariz. 151, 153–54, 575 P.2d 350, 352–53 (App.Ct.1977) (nominal damages serve only to recognize a technical invasion of plaintiff's rights); *Behymer v. Milgram Food Stores, Inc.,* 151 Kan. 921, 923, 101 P.2d 912, 913–14 (1940); *Coates v. Slusher,* 109 Or. 612, 631–32, 222 P. 311, 317–18 (1924). *See* 40 A.L.R. 4th, at 39–40 (collecting cases).

"some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing."

*Id.* (quoting *Travelers Indemnity Co. v. Armstrong*, 442 N.E.2d 349, 362 (Ind. 1982)).

In the present case, plaintiffs presented the testimony of Robert Gomez—a former CF supervisor—that Bruce was on a company "hit list" of disfavored employees. The trial record indicates that the plaintiffs provided further evidence of the existence of the list through the testimony of William Regendanz, another CF employee. Tr. at 460. The existence of such a hit list suggests that Nisun's remark about Cynthia was not simply an angry comment thrown out in the heat of a fight, as CF attempted to portray it, but was instead part of a calculated attempt to cause distress to certain employees and, potentially, to set them up to be fired. We conclude that the plaintiffs established the existence of a hit list by clear and convincing evidence and inferentially, that, in insulting Cynthia and Bruce, Nisun was operating under instructions from management; such a hypothesis is inconsistent with "noniniquitous" human error.

### C.

The defendants assert that the award of $50,000 in punitive damages was excessive in view of the $2.00 award of nominal damages.[10] However, under recent Indiana case law, "[t]here is no rule that the amount of punitive damages must be within a certain ratio to compensatory damages," *Nate v. Galloway*, 408 N.E.2d 1317, 1323 (Ind.App. 3d Dist.1980); *see also Hibschman*, 362 N.E.2d at 849; *Lou Leventhal Auto Co. v. Munns*, 164 Ind.App. 368, 380, 328 N.E.2d 734, 742 (1st Dist. 1975) (upholding an award of $30 compen-

satory damages and $1,500 punitive damages). A "high ratio of punitive damages to compensatory damages 'alone is not conclusive of an improper award.'" *Hibschman*, 362 N.E.2d at 849 (quoting *Lou Leventhal Auto*, 328 N.E.2d at 742). Rather, in determining the reasonableness of the amount of punitive damages awarded, the court must ask whether the size of the award indicates that "the jury was guided by passion and by prejudice." *Murphy Auto Sales v. Coomer*, 123 Ind.App. 709, 720, 112 N.E.2d 589, 593-94 (1953). In answering this question, a court must consider not only the amount of compensatory damages awarded, but also the nature of the tort, the extent of actual damages sustained, and the defendant's economic wealth. *Nate*, 408 N.E.2d at 1322.

The application of these factors to the present case indicates that the $50,000 in punitive damages awarded against CF is not so large as to appear to be the result of "passion or prejudice" despite a nominal compensatory award of $2.00. By their very nature, the torts of invasion of privacy and intentional infliction of emotional distress require that the plaintiff prove intentional or outrageous conduct on the part of the defendant. Moreover, evidence of a campaign of harassment by management against certain employees could certainly account for the size of the punitive damage award.[11] Further, the defendant in the present case is quite wealthy. The record indicates that CF is the largest trucking company in the country, with freight revenues of over a half billion dollars during the first six months of 1985 and net income of 23.7 million dollars during that same period. Tr. at 355. A punitive damage award of $50,000 against the defendant in this case does not seem excessive.

AFFIRMED

---

**10.** The $50,000 apparently represented a lump sum award for both of Bruce's claims; the record is not clear on this point.

**11.** Contrary to CF's argument, the jury was not instructed that it could not consider the "hit list" in awarding punitive damages. The jury was told only that the list could not be considered in calculating *compensatory* damages. Tr. at 593.